## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Janice Edwards,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 1:13-cv-00709 (APM)** |
| | ) | |
| **Ocwen Loan Servicing, LLC, *et al*.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

This case concerns events that led Plaintiff Janice Edwards to sell a residential property in Northeast Washington, D.C., which she had owned since at least 2003.  In late 2008, the District of Columbia's Department of Consumer and Regulatory Affairs designated Plaintiff's property as "vacant," resulting in a substantial increase in her annual property tax for the 2009 tax year. Plaintiff never paid the increased tax assessment, resulting in a tax lien and the eventual tax sale of her property in 2011.  Plaintiff's mortgage loan servicer, Defendant Ocwen Loan Servicing, LLC, which had taken over loan servicing earlier that year from Litton Loan Servicing, LP, exercised its right to redeem the property by paying the past-due taxes and associated costs.  This allowed Plaintiff, at least temporarily, to retain ownership of the property.  Ocwen then sought to recover from Plaintiffs the costs associated with redemption, including the sums Ocwen had advanced to satisfy the unpaid property taxes.  Unable to pay Ocwen the redemption-associated costs in full, and facing foreclosure by Ocwen, Plaintiff sold the property in March 2013.

Two months later, Plaintiff filed a Complaint against Defendants Ocwen Loan Servicing, LLC, and Ocwen Financial Corporation, alleging eleven causes of action stemming from Defendants' allegedly improper service of Plaintiff's mortgage loan. Defendants filed a Motion to Dismiss as to all eleven claims. In March 2014, Judge Leon granted Defendants' Motion as to all but one claim—breach of fiduciary duty by Defendants in their capacity as Plaintiff's escrow agent.

In June 2015, Defendants filed a Motion for Summary Judgment on Plaintiff's claim for breach of fiduciary duty. Plaintiff filed a Cross-Motion for Summary Judgment in response. Defendants then moved to strike Plaintiff's Cross-Motion in whole and also moved to strike certain exhibits. These motions are now before the court.

Upon consideration of the parties' submissions and the record evidence, the court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment. The court finds that Plaintiff's claim for breach of fiduciary duty is barred by the statute of limitations. Plaintiff also has not shown that Defendants can be held liable for the conduct of their predecessor, Litton Loan Servicing, LP, under a corporate "successor" theory of liability. Defendants' Motions to Strike are denied as moot.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     Refinancing the Property

In February 2003, Plaintiff Janice Edwards refinanced the mortgage for a residential property she owned in Northeast Washington, D.C., located at 624 19th Street N.E. (the "Property"). *See generally* Pl.'s Cross-Mot. for Summ. J, ECF No. 38 [hereinafter Pl.'s Cross-Mot.], Ex. D, ECF No. 38-7 [hereinafter Pl.'s Ex. D]; Compl., ECF No. 1, ¶ 20. The refinanced

mortgage was held by SouthStar Funding, LLC, Pl.'s Ex. D at 4, with loan servicing rights assigned

to Litton Loan Servicing, LP ("Litton"), Compl. ¶¶ 20, 22.  In September 2011, the loan's servicing

rights were transferred to Defendants Ocwen Loan Servicing, LLC, and Ocwen Financial

Corporation (collectively, "Defendants"),[1] as result of Defendants' acquisition of Litton in mid-

2011.  Pl.'s Cross-Mot., Ex. I, ECF No. 38-12 [hereinafter Pl.'s Ex. I], at 2; Compl. ¶¶ 27-28.

### 2.    *Plaintiff's Tax Problems*

In late 2008, Plaintiff began to encounter problems with the assessment of taxes on her

Property.  First, in October 2008, an employee of the District of Columbia's Office of Vacant

Property ("OVP"), which is a component of the Department of Consumer and Regulatory Affairs

("DCRA"), determined that Plaintiff's property was vacant, based on the "excessive growth,"

"trash [and] debris," and "defective gutter" on site.  Defs.' Mem. in Support of its Mot. for Summ.

J., ECF No. 36-1 [hereinafter Def.'s Mem.], Decl. of Christopher M. Corchiarino, ECF No. 36-12

[hereinafter Corchiarino Decl.], Ex. B , ECF No. 36-14, at 6.  A notice of these findings was posted,

presumably at the Property,[2] on October 9, 2008.  *Id.*  A follow-up "vacant property survey" by

OVP on October 23, 2008, confirmed that the property was vacant, and further noted that there

was "structural damage," the "awning [was] defective," and "exposed surfaces [were] peeling and

---

[1] Defendant Ocwen Financial Corporation contends that it is not a loan servicer and has never been involved in the servicing of Plaintiff's mortgage. Defs.' Mem. in Support of its Mot. for Summ. J., ECF No. 36-1 [hereinafter Def.'s Mem.], at 23.  Accordingly, Ocwen Financial Corporation asks the court to enter judgment in its favor.  *Id.*  Plaintiff argues that Ocwen Financial Corporation is an "alter ego" of Ocwen Loan Servicing and that it "intermingle[s]" with Ocwen Loan Servicing "through direct operational involvement."  Pl.'s Cross-Mot. at 32-35.  Therefore, Plaintiff contends, Ocwen Financial Corporation should not be dismissed from this case.  *Id.* at 34.  As discussed below, however, the court grants summary judgment for Defendants on grounds that are unaffected by Ocwen Financial Corporation's relationship to Ocwen Loan Servicing.  The court thus declines to decide the issue and refers to Ocwen Loan Servicing and Ocwen Financial Corporation collectively as "Defendants" for ease of reference.

[2] The record is unclear as to where precisely the vacancy notice was posted.  The notice, however, contains a handwritten notation from the property inspector, which states:  "NOV Posted 10-9-08 3:55 p[m]."  Corchiarino Decl., Ex. B at 6.

[had] rust." *Id*. at 10.   On November 3, 2008, Plaintiff responded by sending OVP a letter informing it that the property had been cleaned up. *Id*. at 11.

Despite Plaintiff's attempt to establish that her property was occupied, DCRA sent Plaintiff a letter on February 20, 2009, informing her that it had "inspected [her] property . . . and deemed it vacant," and notifying her of possible tax consequences. *Id.* at 12.   Plaintiff responded to this notice, Pl.'s Cross-Mot., Aff. of Janice Edwards, ECF No. 38-3 [hereinafter Edwards Aff.], ¶ 9, and on March 27, 2009, DCRA sent Plaintiff a second letter confirming that it had "reviewed and approved [Plaintiff's] request for [a] vacant property exemption,"  Corchiarino Decl., Ex B. at 14. According to DCRA, Plaintiff had provided "sufficient utility bills . . . and rental lease agreements" to verify that the property was "entitled to an exemption for the 2009 tax year and until such time as the property becomes vacant." *Id.*

Yet for reasons unexplained by the record, the exemption did not stick.   On June 9, 2009, DCRA sent Plaintiff yet another letter notifying her that DCRA had "inspected [her] property . . . and deemed it vacant." *Id*. at 19.   It again described possible tax consequences that could result from the property's vacancy designation. *Id*.   This time, however, it appears that Plaintiff did not respond to the notice.

As a result of at least one of these vacancy determinations—it is unclear which—Plaintiff's property taxes increased from $2,152.20 in 2008, to $26,078.00 in 2009.  Corchiarino Decl, Ex. A, ECF No. 36-13, at 38-39, 42-43.  Litton records—corroborated in part by Plaintiff—show that its employees spoke with Plaintiff regarding tax issues in both March 2009 and September 2009.  Pl.'s Cross-Mot., Ex. G, ECF No. 38-10 [hereinafter Pl.'s Ex. G], at 6-8.  Plaintiff's escrow account did not contain sufficient funds to cover the increased taxes and insurance costs.  Litton paid $2,300 toward the 2009 taxes, leaving a tax deficiency of nearly $30,000, including penalties and interest.

Defs.' Mem., Aff. of Kevin Flannigan, ECF No. 36-3 [hereinafter Flannigan Aff.], Ex. C, ECF

No. 36-6, at 1; Corchiarino Decl., Ex. A at 35.

### 3.     Foreclosure, Sale, Redemption … and Sale

Beginning in early 2010, the District sent letters to Plaintiff informing her that unless the

tax situation was remedied, her property would be sold at auction. *Id*. at 29, 34.  Plaintiff did not,

however, pay the past-due amounts. *Id*. at 35.  Consequently, in late 2011, the District included

the Property in its annual tax sale auction, where it was sold to WCP DC23 Holdings, LLC

("WCP").  Flannigan Aff. ¶ 25.

After WCP filed a complaint to foreclose on the tax lien, Defendants exercised their right

of redemption and paid the delinquent taxes, costs, and attorney's fees required to redeem the

property.  *Id*.  Shortly thereafter, Defendants sent Plaintiff a notice informing her, first, that they

redeemed her property after a tax sale and, second, that her escrow account did not contain

sufficient funds to cover the costs of redemption, including the advanced tax payments. *Id.* ¶¶ 29-

30; Flannigan Aff., Ex. G, ECF No. 36-10, at 1-2.  Thereafter, Defendants increased Plaintiff's

monthly payment obligation to recover the delinquent taxes and associated costs and fees.

Flannigan Aff., Ex. G, at 1-2.

Plaintiff was unable to meet her increased monthly payment obligations, and thus,

Defendants moved to foreclose on the Property.  Pl.'s Ex. G at 2-5.  Accordingly, Plaintiff sold the

subject property for $150,000.00 in March 2013.  Edwards Aff. ¶ 15; Flannigan Aff. ¶ 31.  Of the

sale price, Defendants received $106,939.05, consisting of Plaintiff's outstanding principal

balance, the interest owed on that balance, and the outstanding amount advanced by Defendants

to redeem the property.  *Id.* ¶¶ 32-33.  Plaintiff received $29,408.03 from the sale of the Property.

Defs.' Mem. at 9; Flannigan Aff., Ex. H, ECF No. 36-11, at 1.

### B.      Procedural Background

Two months after the sale of her property, Plaintiff filed a Complaint against Defendants.

ECF No. 1.  In her Complaint, Plaintiff asserted eleven causes of action[3] arising from Defendants'

servicing of Plaintiff's mortgage loan.  *See generally* Compl.  Defendants responded by filing a

motion to dismiss contending that Plaintiff had failed to state any claims.  *See generally* Defs.'

Mot. to Dismiss, ECF No. 10; *see generally* Defs.' Mem in Supp. of Mot. to Dismiss, ECF No.

10-1.

On March 5, 2014, Judge Leon dismissed all but one of Plaintiff's claims. ECF Nos. 16-

17.  The *only* claim remaining was Plaintiff's allegation that Defendants had breached their

fiduciary duty to Plaintiff while acting in their capacity as her escrow agent—as distinct from

Defendants' capacity as her loan servicer, which Judge Leon held did not give rise to any fiduciary

duty.  ECF No. 16 at 11-12.  This case was then transferred to Judge Chutkan, and then sent to this

court.

In April 2015, the court resolved various discovery issues affecting the case and set a

briefing schedule for summary judgment.  ECF No. 35.  In accordance with this schedule,

Defendants filed a Motion for Summary Judgment on June 1, 2015.  ECF No. 36.  In response,

Plaintiff filed a Cross-Motion for Summary Judgment, ECF No. 38, which Defendants then moved

to strike as filed without leave of court and in violation of this District's local rules, ECF No. 39.

---

[3] The cause of action were as follows: (1) violations of the Fair Debt Collection Practices Act; (2) violations of the
Real Estate Settlement Procedures Act; (3) breach of contract; (4) unjust enrichment; (5) breach of the implied
covenant of good faith and fair dealing; (6) breach of fiduciary duty; (7) conversion; (8) wrongful foreclosure; (9)
negligent servicing; (10) intentional infliction of emotional distress; and (11) violations of the Consumer Protection
Procedures Act.  *See generally* Compl.

In the alternative, Defendants also moved to strike as inadmissible several exhibits attached to the Plaintiff's Cross-Motion for Summary Judgment.  ECF No. 41.  The parties Cross-Motions for Summary Judgment and Defendants' Motions to Strike are now before the court.[4]

## III.   ANALYSIS

### A.   Standard of Review

A court will grant summary judgment only if a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, while a fact is "material" only if it is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A non-material factual dispute is insufficient to prevent the court from granting summary judgment. *Id.* at 248.  In making its determination, the court reviews all "evidence . . . in the light most favorable to the non-moving party." *N.S. ex rel Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010) (referencing *Anderson*, 477 U.S. at 255).

On cross-motions for summary judgment "each side concedes that no material facts are at issue," although this applies "only for the purposes of [each side's] own motion" and does not mean that a "party [has] waive[d] the right to a full trial on the merits." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982), *abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111 (D.C. Cir. 1999)); *see also Hodes v. Dep't of Treasury*, 967 F. Supp. 2d 369, 373

---

[4] Defendants have argued, as a threshold matter, that the court lacks subject matter jurisdiction because Plaintiff has failed to meet the amount-in-controversy threshold for diversity jurisdiction of $75,000. Defs.' Mem. at 20. The court disagrees.  Under District of Columbia law, punitive damages are available for a breach of fiduciary duty. *See, e.g., Wagman v. Lee*, 457 A.2d 401, 405 (D.C. 1983); *Fireman's Fund Ins. Co. v. CTIA-The Wireless Ass'n*, 480 F. Supp. 2d 7, 14 (D.D.C. 2007) (noting support under D.C. law for the awarding of punitive damages for a breach of fiduciary duty).  Because the alleged breach, if proven, might give rise to punitive damages, the court finds that the amount-in-controversy exceeds $75,000.

(D.D.C. 2013).   The court will "grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63, 67 (D.D.C. 2002) (citations omitted).

### B.      Statute of Limitations

Before turning to the merits, the court frames the contours of Plaintiff's sole remaining claim.   Plaintiff asserts that Defendants, acting as her escrow agent, breached the fiduciary duty they owed to her in several ways.   *See generally* Pl.'s Cross-Mot. at 18-26.   She argues that Defendants (1) failed to advance her property taxes in a timely manner; (2) neglected to notify her that her escrow account lacked sufficient funds; (3) improperly estimated the amount of money in escrow that she would need to meet her costs; and (4) failed to notify her of the Property's vacancy classification.   *Id*.   She does not assert any breach of fiduciary duty, in Defendants' capacity as Plaintiff's escrow agent, arising from their subsequent redemption of her property from WCP.   Nor does Plaintiff allege that Defendants breached their fiduciary duty, in that specific capacity, by increasing her monthly payments after redeeming the Property.

Defendants argue that the applicable statute of limitations bars Plaintiff's breach of fiduciary duty claim.   Defs.' Mem. at 11-13.   Because Plaintiff's sole remaining claim arises under this court's diversity jurisdiction, the court must apply the applicable limitations period under District of Columbia law.   *Hull v. Eaton Corp.*, 825 F.2d 448, 456 (D.C. Cir. 1987).   In the District of Columbia, a claim for a breach of fiduciary duty is subject to a catch-all, three-year limitation period under D.C. Code § 12-301(8).   *See* D.C. Code § 12-301(8); *see also Ying Qing Lu v. Lezell*, 919 F. Supp. 2d 1, 6 (D.D.C. 2013).   Neither party contests the applicability of this statute of limitation.   Defs.' Mem. at 11; Pl.'s Cross-Mot. at 13.   Plaintiff filed her lawsuit on May 15, 2013.

Therefore, if her breach of fiduciary duty claim began to accrue before May 15, 2010, her claim would be time barred.

Generally, for a tort claim such as the one alleged, time for statute of limitations purposes begins to run when the injury occurs. *See Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001) ("[W]here the fact of an injury can be readily determined, a claim accrues for purposes of the statute of limitations at the time the injury actually occurs.") (citation and internal quotation marks omitted).  Here, however, Plaintiff contends that the District of Columbia's "discovery rule" tolled the start of the limitations period.  Pl.'s Cross-Mot. at 10.  Under this rule, a cause of action only begins to accrue once a party knows or, through the exercise of reasonable diligence should have known, of the injury suffered as a result of the wrongdoing. *See Mullin*, 785 A.2d at 298-99; *Bussineau v. President & Dirs. of Georgetown Coll.,* 518 A.2d 425, 425 (D.C. 1986).  Stated differently, under the "discovery rule" a cause of action accrues "when the plaintiff has either actual notice of her cause of action or is deemed to be on inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice." *Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996).

### 1. *Plaintiff's Notice of Her Tax Problems*

Plaintiff asserts that she had no knowledge of the increase in her property taxes or the auction of her property until she was served with the tax sale summons and complaint on November 30, 2011.  Pl.'s Cross-Mot. at 10-11; Edwards Aff. ¶¶ 17-18.  The documentary evidence in the record, however, indicates otherwise.  And Plaintiff's self-serving affidavit does not enable her to avoid summary judgment on Defendants' statute of limitations defense. *See, e.g., Mulhern v. Gates*, 525 F. Supp. 2d 174, 186 (D.D.C. 2007) (finding that "[a] mere unsubstantiated

allegation . . . creates no genuine issue of fact and will not withstand summary judgment" (citation and internal quotation marks omitted)); *see also Carranza v. Fraas*, 820 F. Supp. 2d 118, 124 (D.D.C. 2011) ("Summary judgment [against a plaintiff] is appropriate when a plaintiff's claim is supported by only her own self-serving affidavit and is undermined by other evidence." (citations omitted)).

Multiple documents in the record show that by Fall 2009, at the latest, Plaintiff was on inquiry notice—if not actual notice—of how a vacancy designation could impact the District's tax assessment of the Property.  First, a notice of OVP's initial determination of vacancy was posted, presumably on the Property itself, on October 9, 2008.   Corchiarino Decl., Ex. B at 6.  It also appears that DCRA may have sent a form to Plaintiff informing her of OVP's initial determination of vacancy on October 9, 2008, and/or its second, confirmatory determination of vacancy on October 23, 2008.[5]  *Id*. at 6, 7, 10.  Plaintiff does not deny receiving these disclosures.  More importantly, no matter how Plaintiff received notice of these determinations of vacancy, she clearly knew that the determinations had been made because she attempted to address the issue.  On November 3, 2008, Plaintiff sent OVP a letter "to inform [OVP] that the property has been cleaned up."  *Id.* at 11.  In the letter, Plaintiff noted that she had spoken to OVP on "Friday, October 31," and that she had "[taken] care of the clean up that same day."  *Id*.

Plaintiff was put on further notice of the consequences of a vacant property designation in late February 2009.  A February 20, 2009, letter from DCRA informed her that the Property had once again been found vacant and that serious tax repercussions could result from this change in status.  *Id*. at 12.  In the letter, DCRA stated that it had "inspected [Plaintiff's] property . . . and deemed it vacant."  *Id*.  DCRA also detailed how classification of the property as vacant would

---

[5] Two of these forms were produced in discovery by Plaintiff, but it is unclear whether—or when—either form was sent by DCRA to Plaintiff.  Corchiarino Decl., Ex. B at 7, 20.

give rise to a drastic increase in the rate of taxation. *Id*. Specifically, the letter advised that the District of Columbia taxes vacant property "at the Class 3 real property tax rate" of "$10.00 per $100 of assessed value." *Id*. It further highlighted the significant difference between the Class 3 tax rate and the Class 1 and Class 2 rates, explaining that "[t]he Class 1 tax rate is $0.85 per $100 of assessed value and Class 2 tax rate is $1.85 [per $100] of assessed value." *Id*. Finally, DCRA warned that "[Plaintiff's] failure to register [her] property as vacant will result in [the] property being taxed under the Class 3 rate." *Id*. With the possible repercussions laid out, the letter then described how Plaintiff could register her vacant property or apply for an exemption. *Id*.

Plaintiff does not deny that she received this letter. Indeed, the record is clear that she sought an exemption by "contacting DCRA and providing copies of current lease agreements and utility bills [to prove] the property was not vacant." Edwards Aff. ¶¶ 8-9; *see also* Pl.'s Opp'n to Mot. to Strike Exs. to Cross-Mot. for Summ. J., ECF No. 44, at 7 (correcting the Edwards Affidavit in regards to its description of the February 2009 letter). Furthermore, Litton's internal records corroborate Plaintiff's knowledge of the vacancy determination. Those records show that on March 26, 2009, Plaintiff called Litton to speak with a Litton employee because "he [had] called her letting her know that her taxes are going up every year [$]13000 due to the home being vacant." Pl.'s Ex. G at 8. Plaintiff told Litton that the "property [is] not [vacant]." *Id.* Therefore, by February 2009—at the latest—Plaintiff was on notice that her property had been found to be vacant and was subject to higher taxes.

Plaintiff contends that a subsequent letter from DCRA, dated March 27, 2009, Corchiarino Decl., Ex. B at 14, led her to believe that the "vacancy issue was resolved—[and thus she] had no knowledge whatsoever of any Class 3 tax increase," Pl.'s Cross-Mot. at 10-11. The March 2009 letter stated that DCRA had "reviewed and approved [Plaintiff's] request for [a] vacant property

exemption."   Corchiarino Decl., Ex. B at 14.   According to DCRA, Plaintiff had provided "sufficient utility bills . . . and rental lease agreements" to verify that the property was "entitled to an exemption for the 2009 tax year and until such time as the property becomes vacant."   *Id.* Plaintiff notified Litton of the vacancy waiver.   Pl.'s Ex. G at 8 (internal Litton log stating that Plaintiff had "[s]pok[en] with tax office and verified that property is not vacant").   Litton then made a tax payment for the Property, which totaled "$1100 based on 2008 taxes due to [homeowner] receiving homestead readjustment."   *Id.*

Under different circumstances, the court understands how receipt of an official waiver from DCRA might have caused Plaintiff to believe that the vacancy designation on her Property, and the resulting tax consequences, had been resolved.   But the story does not end there.   On June 9, 2009, OVP sent Plaintiff another letter, again stating that OVP had "inspected [her] property . . . and deemed it vacant."   Corchiarino Decl., Ex. B at 19.   Using the same language as in its February 2009 letter, OVP again described the sharp increase in taxes that would result from the Property's designation as vacant.   *Id.*   Plaintiff claims that she never received this letter because it was sent to an out-of-date address—6628 24th Avenue, Hyattsville, Maryland.   Edwards Aff. ¶ 10 (stating that she had not resided at that address "since 2001").   But Plaintiff's self-serving assertion is flatly contradicted by the fact that the earlier February 2009 vacancy determination letter was sent to the same exact address in Hyattsville, MD, yet Plaintiff responded to it by seeking an exemption from DCRA.   Plaintiff makes no effort to reconcile her knowledge of the February 2009 vacancy designation with her claimed *lack* of knowledge of the June 2009 vacancy designation, when both notifications for were sent to *same exact address.*[6]

---

[6] The court notes that Plaintiff's assertions regarding her place of residence during the time in question have been inconsistent, further undermining Plaintiff's credibility in regard to her statements about the mailing addresses at which she could be reached.   *E.g., compare* Compl. ¶ 1, *with* Edwards Aff. ¶ 16.

Moreover, Plaintiff's claimed lack of knowledge of the June 2009 vacancy designation is flatly contradicted by Litton's records, which show that Plaintiff was aware of tax problems with the Property at least as of September 2009.  On September 10, 2009, a Litton employee contacted Plaintiff "to let her know that her homestead exemption was never reapplied and [the tax office had] charged her [penalties/interest]."  Pl.'s Ex. G. at 6.  In response, "[Plaintiff] stated she w[ould] contact the tax office to get them to correct the taxes and then [would] call [Litton] back with the correct amount to pay."  *Id.*  That same day, Litton's records reflect that Plaintiff did "contact[ the] tax office to have them correct the taxes due" and then informed Litton that the "taxes would take 3 weeks to [ ] correct."  *Id.*[7]  Plaintiff does not dispute the accuracy of Litton's internal records.[8] Plaintiff, therefore, surely would have learned from her inquiry of the "tax office" that (for whatever reason) the vacancy waiver was not effective, that her Property had been assessed at the vacant property rate, and that her tax obligations for 2009 were substantially higher than if assessed at the residential rate.

For reasons that are unclear, whatever discussion Plaintiff had with the tax office in September 2009 did not result in a change to the Property's vacancy designation.  Corchiarino Decl., Ex. A at 35, 38, 39.  But regardless of the reason for the non-correction, it is clear that Plaintiff was on inquiry notice of the vacancy designation and its tax consequences before May

---

[7] Litton also made an inquiry of the tax office in 2009.  Its records reflect that the tax office told one of its employees that "once taxes are corrected the [penalties/interest] would drop of[f]."  *Id.*

[8] Plaintiff contends, however, that her conversation with Litton only involved discussion of her property's "homestead exemption" and thus she was not aware of the vacancy assessment.  Pl.'s Cross-Mot. at 14.  But it is hard to believe that the conversation about the "homestead exemption" did not reference the Property's vacancy designation.  Under District of Columbia law, a homeowner is not entitled to a "homestead exemption" unless the property is the owner's principal residence.  *Homestead/Senior Citizen Deduction*, Office of Tax and Revenue, otr.cfo.dc.gov/page/homestead-senior-citizen-deduction (last visited Dec. 28, 2015).  Thus, Plaintiff could not have been asserting her entitlement to a "homestead exemption" unless she also claimed that her property was her primary residence and therefore not vacant.  Whatever the case, the court finds it hard to believe that, when Plaintiff inquired about the Property's tax status with the "tax office," she would not have been informed about the unpaid taxes resulting from the higher vacant-property tax rate.

15, 2010, three years before she filed suit against Defendants.  As the Property's owner, she had a "duty to act reasonably under the circumstances in investigating matters affecting her affairs." *Diamond*, 680 A.2d at 372.  Plaintiff did investigate problems relating to her Property's tax assessment before May 15, 2010; indeed, she received ample notice from DCRA and from Litton about the problems.  She simply did not succeed in correcting them.  If Litton was to blame for the consequences of her tax problems, Plaintiff waited too long to file suit.

Plaintiff contends that the Property represents "nearly a quarter century of [her] financial investment."  Pl.'s Cross-Mot. at. 12.  She argues that this length and level of investment shows that "[h]ad [she] known of the property tax increase and tax sale, she certainly would not have stood by and allowed these events to transpire uncontested."  *Id*.  But Plaintiff's substantial real estate investment experience suggests something else as well.  After "nearly a quarter century" of making mortgage and tax payments, Plaintiff must have understood the importance of timely receiving and scrutinizing tax and mortgage documents.  Thus, when DCRA sent its February 2009 letter to Plaintiff's "old" address—which she somehow received—Plaintiff should have notified DCRA and other relevant agencies, including the tax office, about her correct address.  Had she done so, she would have received at her current mailing address tax documents informing her of the 2009 tax increase and of the possibility that the Property might be sold at auction.  Corchiarino Decl., Ex. A at 27, 29, 32, 33-35, 38-39.[9]  Plaintiff's assertion that she was a dedicated property investor who would not have shirked her tax obligations is belied by her inaction.

In summary, the court finds that there is no genuine dispute of material fact that Plaintiff was on inquiry notice about the vacancy-designation of her Property and the attendant tax

---

[9] As early as 2010, the District of Columbia, through the Office of Tax and Revenue, warned Plaintiff that "unless the amounts in arrears on this bill are paid by the payment due date, the Office of Tax and Revenue will sell this property at this year's tax sale."  Corchiarino Decl., Ex. A at 29, 34.  Bold capitalized letters highlighted the urgency of the situation, stating a "**NOTICE OF INTENTION TO SELL THIS REAL PROPERTY AT TAX SALE**" and

consequences by, at the very latest, September 9, 2009.  The three-year limitations period on her

breach of fiduciary duty claim, therefore, expired on September 9, 2012.  As Plaintiff did not file

her Complaint until May 15, 2013, her breach of fiduciary claim is time barred.

### 2.    *Plaintiff's Lulling Claim*

Plaintiff argues that Defendants cannot assert a statute of limitations defense because they

"lulled" her into inaction on her claim.  *See* Pl.'s Cross-Mot. at 13-15.  Under District of Columbia

law, "a defendant cannot assert the bar of the statute of limitations, if it appears [the defendant]

has done anything that would tend to lull the plaintiff into inaction, and thereby permit the

limitation prescribed by the statute to run."  *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986)

(citation and internal quotation marks omitted).

In order for the lulling doctrine to apply, "[t]he defendant must have done something that

amounted to an *affirmative inducement* to plaintiffs to delay bringing action."  *Id.* (citation and

internal quotation marks omitted) (emphasis added).  In addition, "concrete evidence must be

presented that clearly establishes that such [inducement] occurred."  *Jones v. Gov't Emps. Ins. Co.*,

621 A.2d 845, 847 (D.C. 1993) (citation omitted) (reviewing evidence to determine if defendant

"made any affirmative inducement, or representations or promises" to plaintiff); *see also William

J. Davis, Inc. v. Young*, 412 A.2d 1187 (D.C. 1980) (finding that the plaintiff was lulled into

inaction where defendant affirmatively advised plaintiff, an unsophisticated employee, that it was

unnecessary for defendant to report the hours plaintiff worked).  On the other hand, "[m]ere silence

or failure to disclose generally does not rise to the level of affirmative misconduct."  *Daniels v.

Potomac Elec. Power Co.*, 100 A.3d 139, 142 (D.C. 2014) (citation and internal quotation marks

---

proclaiming that Plaintiff should "**ACT NOW TO ENSURE THAT YOUR REAL PROPERTY IS NOT OFFERED AT TAX SALE!**"  *Id.*  Plaintiff was also informed that "[i]f this property is sold at the tax sale, [Plaintiff] will incur significant additional fees and charges to redeem the property."  *Id.*  All of these documents were sent to Plaintiff's "old" address in Hyattsville, Maryland.

omitted).  Furthermore, when evaluating a claim of "lulling," the court must keep in mind that the "doctrine was designed to create a very narrow equitable exception to rigorous filing requirements."  *Id.* (citation and internal quotation marks omitted).

Here, Plaintiff claims that Defendants made "omissions of material fact" and "fail[ed] or refus[ed] to notify [Plaintiff] of the property tax increase" either in conversations with her or in the annual escrow statements sent to her.  Pl.'s Cross-Mot. at 13-14.  But the record does not support that assertion.  If anything, it establishes the contrary.  Litton's records show that its employees spoke with Plaintiff about the Property's tax issues, Corchiarino Decl., Ex. B at 6-8, and Plaintiff herself admits that she had conversations with Litton employees about problems pertaining to the Property's tax assessment, *see* Pl.'s Cross-Mot. at 14.

Nor has Plaintiff pointed to any evidence that Defendants, in an effort to mislead her, said that they would resolve any tax issues that arose or pay any increase in taxes on her property, regardless of the amount.  *See Jones*, 621 A.2d at 847 ("[A]ppellant has never contended that appellee ever acknowledged any indebtedness or made any 'promise to pay.'").  And, even if Defendants had known about the tax issues and did not inform Plaintiff of them, this "failure to disclose" would not rise to the level of "affirmative misconduct."  *Daniels*, 100 A.3d at 142.  Defendants did not lull Plaintiff into sitting on her claim.

C.    **Successor Liability**

Plaintiff also loses her case on summary judgment for another reason.  She has not offered sufficient facts to show that Defendants are liable for the acts or omissions of Litton, the company that was Plaintiff's escrow agent in 2009 and 2010 and whose assets Defendants acquired in 2011.[10]

---

[10] Defendants argue that Plaintiff "did not allege in her Complaint that any type of successor liability applied in this case with regard to Litton and Ocwen."  Defs.' Reply Mem. in Supp. of its Mot. for Summ. J., ECF No. 40 [hereinafter

Under District of Columbia law, "a business entity which acquires the assets of another business is not liable for its predecessor's liabilities and debts." *Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 89 (D.C. 1994). However, there are several exceptions to this general rule, one of which is that "[l]iability will be imposed on the successor entity when . . . the buying corporation is a 'mere continuation' of the selling corporation." *Id*. at 89-90 (citations and internal quotation marks omitted).

To determine whether a purchasing corporation is a mere continuation of an acquired corporation, the court should consider a multitude of factors, including

> whether there is a 'common identity of officers, directors, and stockholders in the purchasing and selling corporations,' (2) 'the sufficiency of the consideration passing from one entity for the sale of its interest in another,' (3) whether the old entity 'failed to arrange to meet its contractual obligations,' and (4) 'whether there is a continuation of the corporate entity of the seller.'

*Sodexo Operations, LLC v. Not-For-Profit Hosp. Corp.*, 930 F. Supp. 2d 234, 238 (D.D.C. 2013) (citing *Bingham*, 637 A.2d at 91-92). A "mere continuation" occurs when "there is a continuation of the corporate entity of the seller—it's not enough that there is a continuation of the seller's business operation." *Sodexo*, 930 F. Supp. 2d at 238-39 (quoting *Direct Supply*, *Inc*. *v. Specialty Hosps. of Am.*, 878 F. Supp. 2d 13, 21 (D.D.C. 2012)) (internal quotation marks omitted).

Courts also have evaluated related factors, such as the similarity of the names, mailing addresses, and actual business area and operations of the purchasing and selling entities, *see, e.g.*, *Reese Bros., Inc. v. U.S. Postal Serv.*, 477 F. Supp. 2d 31, 41 (D.D.C. 2007), as well as the purchasing entity's use of the same employees, trucks, and equipment and its decision to notify—

---

Defs.' Reply], at 7. They contend that Plaintiff "is now attempting to amend her Complaint through her opposition brief, which is impermissible." *Id.* The court, however, finds that Plaintiff's allegations that "Defendants acquired Litton," Compl. ¶ 27, and "transfer of servicing rights created privity of contract between Edwards and the Defendants," *id*. ¶ 29, provide a sufficient basis in the Complaint to have put Defendants on notice of Plaintiff's theory of successor liability.

or not notify—affected employees, *see, e.g., Bingham*, 637 A.2d at 90 (referring to a Missouri

Court of Appeals opinion, *Brockmann v. O'Neill*, 565 S.W.2d 796, 797-99 (Mo. Ct. App. 1978),

to address factors to consider when deciding if a continuation exception is warranted).  Finally,

because successor liability is predicated on the fact that the "predecessor entity is absorbed into

the successor and ceases to exist as a viable or functional business," the mere continuation

exception is inapplicable where "the predecessor entity remains a viable business concern."

*Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 1, 10-11 (D.D.C. 2013).

Plaintiff has wholly failed to carry her burden of establishing that Defendants are a mere

continuation of Litton.   *See Sodexo*, 930 F. Supp. 2d at at 239 (placing burden of proof on the

plaintiff).  As a threshold issue, Plaintiff does not dispute the fact that Litton "continues to exist as

a separate business entity."  Defendants have offered a certification from the Delaware Secretary

of State showing that Litton continues to exist as a viable, separate entity.  Corchiarino Decl., Ex.

C, ECF No. 36-15, at 2.  Because "successor liability presumes that the predecessor entity is

absorbed into the successor and ceases to exist as a viable or functional business," *Alkani*, 976 F.

Supp. 2d at 11, the continued existence of Litton precludes Plaintiff's assertion that Defendants

are a "mere continuation" of Litton; *see also Bingham*, 637 A.2d at 90-91.

In addition to the fact of Litton's continued existence, Plaintiff also has offered little

evidence to support her "mere continuation" theory.    Plaintiff's argument relies on one piece of

evidence:   Ocwen Financial Corporation's Annual Report.   In the report, Plaintiff claims,

Defendants "admit[] [they] 'acquired Litton . . . in order to grow [their] Servicing segment'" and

"'[t]he Servicing segment comprised nearly 100% of [their] total revenues in 2010 and 2011, [and]

represents [their] sole reported business segment following the change in our reporting structure.'"

Pl.'s Cross-Mot. at 17.  In other words, Plaintiff seems to imply that because Litton was acquired

to grow Defendants' loan servicing business, and the purchased Litton assets now comprise nearly all of Defendants' annual revenues, Defendants are essentially a rebranded Litton.   In further support of this theory, Plaintiff points to Defendants' "critical" "integration of Litton's mortgage servicing 'systems, procedures, and personnel.'"   *Id.*

But this evidence shows only that Defendants have successfully incorporated Litton's assets into their company.   And that is not enough.   Plaintiff has failed to demonstrate that there is a "continuation of the corporate entity of the seller."   *Direct Supply*, 878 F. Supp. 2d at 21.   Nor has Plaintiff provided any evidence that the officers, directors, or stockholders of Litton and Defendants overlap.   *See Colonial Ice Cream Co. v. Southland Ice Utils. Corp.*, 60 App. D.C. 320, 321-22 (D.C. 1931) (finding that a purchasing company with substantially the same stockholders and officers as a selling company constituted a continuation of the selling company).   She also has not offered evidence regarding the sufficiency (or insufficiency) of the consideration exchanged in Defendants' purchase of Litton.   *Bingham*, 637 A.2d at 92.   Nor has she shown that Defendants' purchase agreement with Litton provided that Defendants would assume Litton's liabilities.   And, she has not established that Defendants have held themselves out to be a "remodeled" Litton.   In fact, Plaintiff herself has entered a letter from Litton into the record showing that Litton expressly notified clients that its loan servicing would be transferred to Defendants.   Pl.'s Ex. I at 2-6; *see Brockmann*, 565 S.W.2d at 798 (holding that the mere continuation exception was met where, among other issues, the successor entity did not inform its contractors of the change in entities).   Finally, nothing in the record suggests that Defendants entered into the purchasing agreement with Litton in order for either company to avoid its creditors.   *See Bingham*, 637 A.2d at 90-91 (describing cases in which defendants were held liable under the mere continuation exception because they had formed new entities merely to escape liability on their debts).

And although Plaintiff highlights the integration of Litton's personnel and procedures into Defendants' business, she has not specifically shown any similarities in operations or provided details of the supposed similarities in use of equipment and employees. *See Sodexo*, 930 F. Supp. 2d at 239 (finding that a hospital that operated under the same trade name, used the same physical address, and employed many of the same employees and the same CEO as its predecessor did not meet the mere continuation exception). In short, Plaintiff has failed to come forward with sufficient evidence that would establish that Defendants are successors to Litton's liabilities.

## IV.   CONCLUSION

For the reasons stated above, the court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment. Defendants' Motions to Strike are denied as moot. A separate Order accompanies this Memorandum Opinion.


Dated:  December 29, 2015                      Amit P. Mehta
                                               United States District Judge